All right, we call the next case 20-11032, Continental Automotive v. Avanci. All right, counsel, before you start, you know, we have a lot going on in this case. We're clear about that. We get these late-breaking quote 28J letters, but I don't want to spend the whole argument about these 28Js. You know, the rules say it's what it is. An argument could be made, well, maybe this isn't properly 28J. It's there. We haven't ruled on that. We may just fold it into the case as a whole and figure it out whether it's in or not. But you got enough other issues to deal with. I'm not saying don't talk about it, but don't spend exponential time fighting over the 28J and DOJ and all that when there are all these other issues in the case that need, you know, fleshing out. But it's your time. Use it, you know, the way you want to use it. All right. That said, first up, Mr. Scarborough for Continental. Thank you, Your Honor. Good morning, and may it please the Court. Mike Scarborough for Plaintiff Appellant Continental. We are here following a decision on a 12B6 motion to dismiss. We're not here after a full trial. We're not here after a decision on a summary judgment motion. Now, as explained in our papers, the district court erred in many ways, including by applying the wrong legal test on standing, by misinterpreting and misapplying well-established case law on Section 2 of the Sherman Act. But really, its most fundamental error was in its basic application of Rule 12. Rather than credit and draw all reasonable inferences from Continental's well-pleaded allegations in favor of Continental. Cut to the chase. You know and I know that the trial judge here is an extremely experienced trial judge, has handled a whole bunch of complex litigation. Not her first, you know, walk through the park, etc. This thing is transferred down. So, I mean, it's complicated, but I mean, it's not like the judge thought it was a divorce case. You know, so it's there, it's on 12B, and so forth. The main, your start-off argument, and you've got what a 61-page complaint, I think, or something. I mean, it's a behemoth. So, you know, cut to the core of where you're headed in terms of how this got off track. We've got this thing here where y'all talking about evidence that the district court asked for, and there's all these ancillary papers, and it starts sounding like it was a summary judgment instead of on 12B. So, I lose it at points where all this other stuff that's not part of the complaint seems to get beat it in, yet we're on the 12B. Do you follow what I'm saying? So, I want to initially be where you are on the 12B determination, and how the district court, from your standpoint, got off track. Is it the legal standard that you're saying she failed it here too? Is that the your honor's point about the submissions that were asked for at the case management conference in January of last year, which we've referred to in the papers as the harm documents? The district court later made it clear that it did not consider those submissions in deciding the 12B6 motion. So, you know, we can talk about what do those documents mean for potentially for amendment of the complaint, but the district court did not consider those for purposes of the 12B6 motion. So, what we're left with and what we should be considering is really just Continental's complaint, and our position is that the district court did not properly credit what was in Continental's complaint. So, I'll give you a few examples of that and why it really matters. So, in talking about the section one claim, what the district court concluded was that there couldn't be a section one violation because the Avanci agreement allows the licensee or defendants to independently license outside the pool, and the court also found that certain licensee or defendants have responded to Continental's request for individual standard essential patent licenses. And so, what the court effectively found was that individual licenses are fully and realistically available, and that is the only issue that's in dispute with respect to the section one claim. But Continental's allegations in the complaint are that individual licenses are not being offered, and the district court just disbelieved or decided, you know, not to pay any attention to those allegations. They're not being offered at all, or they're not being offered at a price that you want? Direct licenses are not being offered at all. Those are the allegations of the complaint, and even today, full direct licenses are not being offered to Continental. It's completely clear from the record. So, if the court, the ultimate issue in dispute in section one to determine whether or not there's an actual restraint of trade is where license is fully and realistically available, that's a fact-intensive inquiry. That's something that you could maybe resolve on summary judgment, or maybe you could resolve it at a trial, but you can't take Continental's allegations that are blow by blow through each of the defendants that walk through how full direct licenses are not being offered at all, not even talking about price. You can't ignore those and draw that conclusion and decide the section one issue against Continental. So, that's one example. Another example is with respect to section two, where the district court really speculated that the standard-setting organizations might have adopted the defendant's technology, even if they had been advised by the defendants that they had no intention to abide by their FRAN commitments. First, that's just pure speculation, not really proper on a 12b6 motion, and it's a conclusion that's expressly contradicted by the relevant SSO policies of Etsy, of TIA, and Addis, and it's also directly contradicted by the specific allegations of the complaint. We know and have alleged that defendant's IP would not have been incorporated into the standards had defendants come clean with their licensing intentions. So, if Continental were somehow unable to back up those allegations at trial, you could have a trial finding on this point, and that would essentially be the issue in Rambis. That was the issue the DC finding on a rule 12 motion to dismiss, given our specific allegations on that point. So, those are two very stark examples on section one and section two. There's another important example, which is with respect to antitrust standing, and we did discuss this in the papers. The district court found that the harms Continental alleged from not having a direct license were sufficient injury for purposes of article three standing, irrespective of any of the indemnity obligations and indemnity issues, but then the court turned around and didn't pay any attention to those same allegations of harm when it came to antitrust standing, and all you have to do is credit those same allegations that Continental has been harmed by not having a direct license, and it's very easy to get to a finding of antitrust standing. Boycotted purchasers have antitrust standing. That's a basic principle of antitrust law. That's Blue Shield versus McCready. That's the doctor's hospital case in this court, and the cases that have applied Broadcom have certainly found that would-be licensees, subject to non-Fran demands, have antitrust standing. This is not the type of the Pueblo bowl amount case where the bowling alley was subject to increased competition because a bowling alley stayed in business due to a merger. This is a very clear case of standing. All the district court had to do was credit the same allegations that it had credited for purposes of the article three analysis, so those are three examples on really the most important issues of the case, each of the issues. I'd like to turn briefly to the notion that also came up in the letter brief that was submitted by the defendants on Monday that the defendant's conduct has not harmed competition, and first thing I'd note about that is that we're dealing with allegations of a group boycott, which in most scenarios are condemned as per se illegal. We're only looking at the rule of reason here because we're dealing with a patent pool, but what defendants are doing is collusively engineering who can access their IP for the purpose of driving up their price. That's a distortion of the competitive process, but second, with respect to section two, defendants have completely subverted the SSO's and undermined the FRAN's safeguards that keep the standard setting process competitive, as found by the Supreme Court in ally two. That's not competition on the merits. That's the willful acquisition of monopoly power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident, and that's what section two precludes. And the conduct that defendants have been committing has had real effects on competition at every level of the automotive supply chain. In the first instance, you have the displacement of the competitive process that's been required by the SSO's for the development of standards, and it's altered what IP is included and how the standards are shaped, and then post-standardization you have the defendants' abuse of their unlawfully acquired monopoly power to harm competition. You have reduced innovation by tier one, tier two, and tier three component suppliers. You have increased costs at every level of the supply chain, and you have reduced output and choices, and yet the end result is you have higher prices to consumers. It's not just Continental saying that. We have the friend of the court submission by automotive OEMs themselves, Honda and Tesla, talking about not only the harm to them, but the harm at every level of the supply chain. So I want to say a little bit more. I want to understand how your theory implicates price. As I understand it, everybody agrees that the auto manufacturers themselves have access to Fran pricing for all the relevant patents, right? We don't agree with that. We don't agree that the price that's being offered by the Avanci platform to the automotive OEMs is a Fran price. We think it's radically out of proportion with what would be a Fran price. Well, fair enough. I apologize for my misunderstanding that, but that still gets to my main question, which is they have access to Fran pricing just by virtue of the fact that they can litigate those issues, right? I mean, they can go sue, breach a contract, and obtain Fran pricing. So what is ultimately, as long as the courts are in operation and will litigate those issues in good faith, where is the harm to competition in price? Well, the harm to competition is all the things that I just said. And the first thing, the first problem with the scenario you posited is just have the OEMs go out and file litigation. They're not well positioned to do this. An automotive OEM is producing an extremely complicated product with thousands upon thousands of products. You know, there's windshields and seat belts and tires and all kinds of things that go into a car. They are not experts on the connectivity technology that is at issue in this litigation, and that's being licensed by the Avanci pool. Really, Continental is. Continental understands this technology and its products that implement the technology. So the one that has the best ability to negotiate a fair price for that IP is Continental, or maybe even farther up the chain to the one that makes the baseband ship. So the OEMs are not well positioned to negotiate these issues. And they've told Continental repeatedly, this is your problem. This is your product. You're supposed to be giving us products that are free and clear of any IP issues. We expect you to resolve it. And that's why Continental has filed this case. But it's fundamentally, to get back to your original question. Here's my question, though. Why haven't the auto manufacturers joined you in litigation? And pardon my ignorance if there's an obvious answer to that. Well, the auto manufacturers have been involved. They've been sued by the defendants in other jurisdictions. They are being sued all over the place. They're not joining you in this anti-trust theory. No, they regard it as Continental's issue to resolve, because it is Continental's products that are allegedly infringing defendant's IP, and they expect Continental to resolve this issue. But make no mistake, they are very interested in the outcome of this litigation. But they regard it as Continental's problem, because we are the suppliers of the allegedly infringing products. So it's not just about price. If we're talking about the citations that were made in the district court's opinion and the defendant's papers and in the statement of interest below, we're talking about deception as being used for a tool to enable higher prices. What the deception that we have alleged is being used to do is to gain the monopoly power here. They are using deception. They are giving misleading Fran promises to obtain their monopoly power. And it's very clear from Broadcom and from Rambis that you can't do that. And that is the Section 2 offense. And that's very different from the scenario that has been posited by the district court and by the defendants, that this is just about an otherwise lawful monopolist just using that lawful power and deception to get higher prices. It's using deception to gain the monopoly, which they are then abusing by disregarding the safeguards. And with that, I see I'm basically out of time, so I'll reserve the rest for rebuttal. Thank you. All right. Thank you. Reserved five minutes for rebuttal. All right. First, we'll hear from Mr. Lampkin. Thank you, Chief Judge Stewart, and may it please the court. While I would like to focus on the Section 2 claims, the allegations that the defendants individually made fraudulent Fran promises to all the SDOs for every standard, for every technology they own, and Mr. Kessler would like to address the Section 1 claims involving coordinated conduct involving Advanci, we're both prepared to address any issue the court would like to address, including, for example, antitrust standing. But turning to Section 2, everyone agrees that to violate Section 2, you need conduct that is exclusionary, conduct that excludes rivals improperly. The complaint doesn't plead exclusionary conduct for three distinct reasons. First, it fails to plead any rival that was excluded. Second, it feels it doesn't plead conduct that can be exclusionary within the meaning of antitrust laws. And finally, it fails to meet the requirements of Rule 8, Rule 9, and Iqbal and Twombly. Turning to the first issue, the complaint identifies no technology, no rival that was or anything like that. And you just can't have exclusionary conduct without a rival or a technology that has been excluded. Exclusion requires somebody being excluded. Now, under Iqbal, you have to plead facts, facts that plausibly give rise to a claim to an entitlement to relief. And what's missing here are facts. There is simply no fact suggesting that there was exclusionary, that anybody was excluded. In Iqbal, for example, you had to plead facts that supported discriminatory intent. In Twombly, you had to plead facts that suggested an agreement. Here, you need facts that support exclusion. And those facts are just simply absent from the case. Second, insincere friend promises can't be exclusionary as a matter of law. Once the engineer working groups choose a technology, the SDO asks for a judicially enforceable commitment to license on friend terms. That's something that people can take to the court and enforce. Whatever Continental might allege about hidden mental mistakes, the commitment is a commitment and it's enforceable as such. An exclusion of one technology that is subject to a friend commitment in favor of a superior technology that is subject to an also enforceable friend commitment simply isn't exclusionary conduct. Continental's contrary view would convert every fight about price into an antitrust action. In fact, Continental says exactly that in paragraph 183 of its complaint. It says that the quote, anti-competitive effects are the same, where the defendant licensors intentionally deceived the SSOs at the time they made friend promises or later breached their friend promises once their technologies were adopted. From an antitrust perspective or an economic perspective, there's just no difference between a friend promise that's supposedly insincere and a friend promise that's made by someone who legitimately wants to give friend terms, but may have an overinflated view of the value of their technology. And in turning all these into antitrust cases comes, as Judge Lynn noted, as the Ninth Circuit noted in FTC versus Qualcomm, it comes with enormous costs. The SDO process has been the engine of economic development, the driving of technological progress. There's a reason 5G is so much better than 4G, 4G is better than 3G, and 6G is going to be better than all of them. And the reason is that you have innovators coming into the process to participate. But if you threaten them with treble damages, every time someone with no facts says, gee, your friend promise was fraudulent, then they're not going to participate and that destroys the process. And it does so for no legitimate value. There's simply issues like simply don't exist anymore. One, because as Judge Ho pointed out, the friend promise can be enforced in court. Under eBay and similar rulings and other courts, you can't get an injunction if you're not obeying friend. And finally, if you sue for damages, what are your damages capped at? They're capped at friend. The notion that somehow or another there's an anti-competitive injury here that needs to be adjusted outside of a contract simply isn't correct. What do you make of, what's your response to opposing counsel's point that there is a fact issue here, namely, that they can't get access to these patents, not only through Avinci in the bundled format, but even individually. And therefore, they should at least be able to develop those facts. Yeah. So without, I risk stepping on Mr. Kessler's toes, because that sounds like it's more in the land of Section 1. But I think the short answer on that one is you need actually competitive injury, you need injury to competition. And they plead themselves out of injury to competition because they say, gee, we make TCUs for automakers. And who are they competition with? Other TCU component makers. They don't. But then they allege that, hey, we're actually all in the exact same boat. So, for example, if you look to. Is your main point that basically there's just there's a mismatch in terms of what level of the marketplace is the alleged anti-competitive conduct? Well, I think that the alleged anti-competitive conduct for Section 2 purposes, they say that occurred at the SDO, but without any facts to back it up. And with respect to Avinci, yes, I think the argument is that we're overcharging OEMs. But the problem with that is, look, there's no competitive effect with respect to TCU makers because they're all in the same position. If you look at paragraph 149, the practice applies to all other implementers in the supply chain. Everybody's treated equally. So you're not having a competitive issue or a record on appeal where he argues that all tier one suppliers are, quote, in the same boat. There's just no antitrust injury. You don't have and you have a competitive impact. Turning back. Let me come back. Just I guess the first was where I was. I mean, there are, as you say, a hundred and I don't know, 80 something paragraphs in this complaint. And I know that girth doesn't necessarily mean that, you know, it carries the day. But every paragraph, every allegation, sufficiently complicated. I mean, it's complex. This is a complex issue. And I fully recognize it will involve antitrust cases. But as I said, in looking at this case, the back and forth about submissions, about evidence, I know the district court said she didn't consider the things that were presented. It just had first principles seem sufficiently complicated and complex. The 12B6, even if you're right, at the end of the day, just somehow seems to be the wrong death. Now, don't get me wrong. I know 12B6 is there for a reason. I got you. But it just seems to both of you going back, we got amicus all over the place. MSI on both sides of the issue. We got academics in here, you know, plowing in and so forth. You're back and forth on the DOJ letters and so forth. So, I mean, at some level, it seems like pouring it out on a 12B6 when it has all the features, to me, of a summary judgment to where, you know, there is this back and forth. It's doing the evidence and all that. And if it's poured out there, that just seems, but I'm not saying, you know, if you got a 12B, you got one in your entire term. But if I want, I'm saying, I'm just saying the way this whole thing's shaped out from the transfer, you know, back to the amended pleadings to comply with the Fifth Circuit, then there's these submissions and then there's a year and there's all this stuff that you just track differently than when you're just looking at the complaint that you pointed out in 178. So, it's hard to get a handle on what's going on here if it's really a 12B versus a summary judgment kind of thing in disguise. Do you follow my problem? I think so. And I think you have exactly the right point, which is 12B is about the complaint. And the deficiency here is in the complaint. And that's the final deficiency I actually wanted to turn to. It's not just the fact they don't identify an excluded rival, which you factually have to do. It's that they don't meet Rule 9B's particularity requirement. Rule 9B says, if you're alleging fraud, and this is about fraud, you need the who, what, where, when. In fact, they don't even meet the Rule 8 requirement under Twombly and Iqbal. It's the opposite of particularity. It just lumps all the defendants together, all the standards, all the technologies, and said, well, everything you said, all of your promises, those were fraudulent. And it's particularly inadequate because, Judge Stewart, of the cases you identified, Twombly and Iqbal. Now, Twombly said you can't just say there was an agreement. You need facts suggesting that there was an agreement. Iqbal, which is almost on point here, says you can't just say there was discriminatory intent, conclusion. You have to allege facts that that plausibly allege fraudulent intent in submitting those, the commitments. All right, well, let me stop you there. Not one fact there that suggests fraudulent intent. All right, let me stop you there. I got your point. And to a latter point, which is before us, but which, you know, may or may not get. And that's, you know, they complain about the request for leave to amend the complaint. And so the district court didn't allow amendment, the thing had been pending for years. And I get it, she says, and so forth. But assume an argument of what you just said. You know, once, paragraph one, doesn't have it, yada, yada, yada. So why then, given the complexity, at a minimum, shouldn't they get a shot to amend if they can? Now, if you're saying it's impossible, there are no facts they could possibly put in to stay in. But I mean, why wouldn't the remedy be, okay, they didn't do it, but now all this is out the door, why wouldn't they get a chance to amend? And I know the light's on, but we got time. So I just want to know, in case we discuss it, why wouldn't they heard all this and they get the chance to say, okay, you get to add two more paragraphs if you can, make your best shot. Why wouldn't that be a reasonable approach, given the complexity? And I think, I'm glad you say that we can go a little over, because the answer comes in two and the futility. On waiver on appeal, the appeal brief doesn't actually list anywhere in its statement of issues, failure to grant leave to amend. But that's not all. If you look at the section two part of the brief, it doesn't mention leave to amend at all, or amendment at all. For section two, there's no argument about leave to amend, much less an argument that would show that the district court abused its discretion in refusing leave to amend. And the district court invoked not utility. The district court also said, hey, you've already had one chance to amend. Hey, this has been pending for quite some time. With no sustained argument, that was an abuse of discretion. That argument is as waived as waive can be. I don't remember seeing anything on reply about that waiver. And second, in terms of the response and the waiver in district court, it's not just when asked, do you want to amend your pleadings? They responded, no. I think our given on page nine and a footnote for the notion that they actually sought leave to amend. Actually, what they said is, we don't need to identify excluded rival. And then in parentheses, they add, although we could if we had to. That's not a request to leave to amend. That's a parenthetical saying we could do it if you force us to. Finally, in terms of the lodge documents, their answer on that is they are lodged documents. They are not part of the complaint, and they didn't need to be considered. They only went to standing only to the indemnity issue on standing. And even there, they weren't sufficient. 16 of the 17 seem to involve an entity other than the continental plaintiff that is the plaintiff in this case. And the 17th doesn't overcome what the district identified as a huge problem on standing in terms of the indemnity issue. Because it doesn't say, hey, we have paid above friend rates, which would be the first requirement for them to have imminent harm, that some OEM, some automaker paid above friend rates. It doesn't have this next step you would require, which would be, remember, the claim here is the injury is we're going to hand up through indemnity paying above friend rates. They don't complain that they'd have to pay friend rates, above friend rates is what they're complaining about. But they don't identify in any of those documents an agreement that says, hey, if the automaker pays above friend rates, it chooses not to litigate even though it has a right, it's going to pass the above friend component, not just the reasonable component, the unreasonable component onto continental. And it certainly doesn't identify anybody who actually has come up with an amount that they paid, and said, I want you to pay this amount. And that's a requirement generally for standing for a ripe issue under indemnity law. And there's no reason why that wouldn't also those really attenuated chain of connection, support the district court's decision that for the indemnity claims, they didn't even have constitutional standing, much less. All right. I'm gonna, I'm gonna stop you there. You were very responsive, responsive to my question, but I wanted to get those out because they're, they're there in varying degrees, but I appreciate that. All right. Mr. Kessler has been anxiously waiting. Mr. Kessler. Thank you, your honor. Good morning. May it please the court. I'm Jeffrey Kessler on behalf of the appellee of ANSI. What I would like to do is first approach to section one issue as Mr. Lamkin indicated, but I want to do this through the lens of the questions of judge Stewart about leave to amend, because we believe there are fatal legal errors in section one and in section two for that matter, and in standing, which cannot be cured. And if they cannot be cured, there's no basis to grant or even consider any leave to amend if you don't accept the view that they never raised it and never presented it properly anyway. So let me start with section one. On section one, their only claim is that the ANSI agreement itself, what's called the master license management agreement, is the section one violation. This is very important. They're alleging parallel conduct. They're not alleging some type of conspiracy outside of the written agreement itself. So you have to say, does that written agreement itself state a section one claim? We don't need any discovery, any new facts. It's in the terms of the agreement. And when you look at the terms of the agreement, it specifically allows for individual licensing by each of the members of ANSI or a platform group license, just like the Supreme Court addressed in the broadcast music case and on remand, the second circuit addressed in CBS. And what they said is if you're offering a group license to IP, it's an alternative, not a restriction, as long as the individual licensing is allowed. Now, what does what is the response to that? Well, you heard counsel for Continental say, well, says we allege we've asked for these licenses and no one will give them to us. You heard him say that just today. And Judge Ho said, well, isn't it true that what you've actually alleged is that they don't offer the price you want? Judge Ho is exactly right. And page 143 of the amendment complaint, which I will quote, this is conversant responding to Continental's request for an individual license. Quote, when conversant responded, it stated that it was offering a FRAN license to its SEP portfolio to manufacturers of cellular functionality and only expressed a willingness to make the same offer to Continental. So, in other words, their own complaint says there was an individual license offered, but they don't like the price. Not liking the price is not a restriction. Similarly, in paragraph four, for Continental, an individual license at the same rate, they don't like that rate either. Instead, Avanci, don't bother. They were not interested in that. So, the point here is there's nothing in the complaint to plausibly support the fact that it's a restriction. Finally, and you may hear this on reply, they point to what's called the double dipping provision in the agreement, which says that you can't get paid twice for the same patent. So, if a company takes an individual license and a pool license, it's up to the patent owner to reduce the fee so they only get paid once. They say this is a restriction, but it's not. There's no larger to it. Two scenarios. If you are a patent owner dealing with a company who has no Avanci license, you have every incentive to offer your license because they may never take an Avanci license individually. You get your fee. If they then do an Avanci license, it's true you can't get paid twice, but you don't end up worse off. You're just in the same spot. Similarly, if someone takes an Avanci license first, they don't need individual licenses, but that's not a conspiracy or restriction. That's broadcast music. It is, in fact, more efficient to offer the group license, as the Department of Justice found in their business review letter. It is more efficient to do that. So, many companies may prefer the group license. That doesn't state a repair. Similarly, this Section 2 claim can't be repaired. To elaborate on what Mr. Lampkin was saying, the problem they have is that they cannot get around the fact that FRAND is a contractual right that can be enforced, as Judge Ho pointed out. Therefore, any exploitation of monopoly power to exclude others can never take place in this context. What happens is that this is in the complaint. Every applicant was required to make a FRAND promise. That's very, very clear. Second, that promise could be enforced. So, there's never any situation where someone has tricked their way into the standard and doesn't have a FRAND obligation. They do have a FRAND obligation. So, you never get to an exclusionary effect, and they say they can't fix that. There's no way to fix that in the amended complaint. They also can't fix the fact that some of the people they're claiming committed a fraud couldn't commit a fraud. For example, they lump all the defendants together and say Avanci's in there, having committed a false FRAND representation. Avanci, they admit, owns no patents. It made no FRAND representations. But somehow, Avanci is thrown into the mix. Two of the other defendants weren't even owning patents at the time the FRAND representations were made. So, again, these are not the type of errors. To Judge Stewart, I would say you're 100% right. There could be many cases where Rule 12 is not appropriate. But here, these fundamental issues cannot be fixed, and they don't identify anything that could fix this because these are legal defects. Finally, on standing, they can't fix those either. They have two standing theories of harm. One is that they suffered harm because the OEMs will overpay for the license and then seek indemnification or reimbursement or put responsibility on Continental. And again, I think Judge Ho said this very well. They're at the wrong level. The anti-competitive harm there, antitrust injury, would be to the OEMs who have not filed a lawsuit. They could file a lawsuit. They have no interest in filing a lawsuit. That's where the anti-competitive harm occurs. This court was very clear on that issue in the Javico case. There's no question this is just like a case where someone who's renting property is the victim, allegedly, of an antitrust violation. That doesn't give standing to the owner of the property who's renting to him, even though they might have a lease that says, I get a percentage of your revenues. If that's contractual, it's at the wrong market level. It can't be fixed. Their other theory of harm is group boycott. And you've heard counsel talk about group boycott, group boycott. What's the problem with that? There might get a license. And what they're alleging is Avanci and the other patent holders aren't asserting infringement against them, aren't seeking for them to be licensed. So they and other component suppliers are totally free to sell their products. So there can't be any antitrust injury. This is not a case where they took a license and said they overpaid. They didn't take a license. This is not a case where they plead that anyone has accused them of infringing or trying to stop them to compete. Now, you may hear counsel say, oh, but we've alleged in the complaint that this impedes our ability to develop new products or develop technology. Every one of those assertions are conclusory. There are no facts there's no way that they actually can assert that. So, again, these can't be fixed. What this really is a case where the auto companies who might have a cause of action to assert don't want to do so. Continental's trying to stand in their place. It has no standing, no antitrust injury to do so. And its real complaint is not that it can't get an individual license, but it doesn't like the price it has to pay. Unless the court has further questions to me. I think I just used up my time. All right. Thank you, Mr. Kessler. Appreciate it. All right. We're back to you, Mr. Scarborough for rebuttal. Thank you, Your Honor. Your Honor is quite correct. These are deeply fact intensive issues. They are fact intensive issues with respect to standing, with respect to section one. On the last page of the district court's order, after all those pages, she says Continental's claims are legally untenable, close quote. She doesn't say anything about facts. She says the claims are legally untenable. I mean, so that suggests to me she had a group around the legal matters that did not find it factual. And the other sides have come at you basically saying you haven't pled facts that would make out a claim. So address straight on their arguments about the legal untenability of the claims. Well, that's just dressing up the court's analysis as a legal analysis. The root cause of the problem was not crediting Continental's allegations. I'll start with what Mr. Kessler said. He claims that the test here is whether individual licenses are allowed just by looking at the advance agreement. That is not what the case law says. Case law says you have to look at whether licenses are fully and realistically available outside the pool. And that by definition- She also points out, though, your own complaint on paragraph 143 essentially concedes that individual licenses were available at the same rates. Your Honor, I have to respectfully disagree with that. I'll start. I don't think you can read the totality of our allegations and say that we've been able to- Well, it does say expressed a willingness to make the same offer to Continental that Conversant had made to one of Continental's OEM customers at the same rate offered to that one defendant that's actually not here on appeal. You look very clearly at our allegations in paragraph eight that says Continental has sought a license from each of the defendants, but has been met- But if this case is only about the agreement and the agreement contemplates individual licenses and paragraph 143 of the complaint gives an example of those individual licenses being available, I'm not sure what's left. Because we're very specific in talking about all the defendants, and we specifically talk about how, in fact, individual licenses are not available. 142, just the paragraph before where we talk about Nokia. Nokia has failed and refused to provide Continental with a direct license, whereby Continental itself would be fully licensed to Nokia's standard essential patents. Panoptis has refused to make any offer whatsoever. The totality of our allegations with respect to individual direct licensing is not that they are available, and it is a deeply- The whole idea that this is just about price and not about the availability of the license is just the defendant's counter-narrative reading of it, and it's not a fair reading of the complaint if you give us certainly the inferences that were due on a 12b6 motion. I take your point. Opposing counsel, I think, says your whole complaint is premised exclusively on just the terms of the agreement. Do you agree or disagree with that statement? I agree that the Section 1 claim is premised on the Evansi agreement, but the case law says that in determining whether or not that agreement actually restrains trade, you have to look outside the agreement. You have to look at what has been the real-world experience, and if you look at the cases, most of which are decided after a trial or a summary judgment, what you have is a very clear record where a Section 1 claim is not found, that there was no attempt whatsoever to obtain individual licenses. Are you alleging- Are you alleging that these various patent holders have separately agreed to deny individual licenses? There are allegations to that effect in the complaint. We believe that that is an inference that could be drawn from the totality of the circumstances. Can you point me to where? I can't point specifically to where that is. I will say that for purposes of the panel's consideration of our Section 1 claim, we are asking you to focus on the Evansi agreement itself, and so we've focused there, and Mr. Kessler is correct in that regard. We believe that is the one issue for the court to resolve with respect to the Section 1 claim. Is there a provision- I'm sorry, I don't mean to monopolize your time, but is there a provision in that Evansi agreement that forecloses individual licensees? No. There's an explicit provision that says the Evansi members can license outside the pool, but that's not the test under the law. The test is whether those licenses are fully and realistically available, and we believe, we have very clearly alleged in paragraph 8, paragraph 142, and with respect to some of the other allegations in there, that there have not been individual licenses available. At the very least, this is a fact issue for resolution on a full record. It's not an issue that should be resolved on a 12b6 motion, and I will just say that Mr. Kessler's characterization that Continental has not been boycotted here. It's not a purchaser. In every boycott case, the company that wants to buy something but that is denied it is by definition not a purchaser. We've been boycotted. We want to purchase something. It's been alleged that our products are infringing defendants' IP, so we are very much a would-be purchaser, which is a classic example of antitrust standing. Let me ask you one last question. Mr. Lampkin argued that, in addition to everything else, your complaint, though it's lengthy, doesn't meet the 9b standard of particularity given the nature of your claims. What do you say about that? We would say that, number one, it's an open question as to whether 9b is required with respect to our particular claim, but even assuming it is, this issue was squarely addressed in Broadcom versus Qualcomm by the Third Circuit. We have very specifically alleged what are the deceptive representations that defendants made. They are given the who, what, when, where, and how. It is each of the defendants' representations to the standard-setting organizations. They know exactly what they are. There are examples of that that are in the record, and so there's no mystery if the goal of 9b is to not keep defendants in the dark about what we're complaining about. There is no mystery here. We know exactly what the allegations are. We know exactly what the representations which we allege are deceptive and which form the basis of the defendant's monopoly power that they're abusing. It's very clear what those are. All right. Okay. All right. I appreciate it. Any other questions from either you, Judge Ho or Judge Englehart, while we've got counsel in cyberspace? All right, counsel. We've got a lot of paper here, but we'll slug our way through it. Obviously, it's an important case, an interesting case, to put it mildly, but we'll work our way through it and get it resolved, and we'll let you know when we do. So, thanks for your briefing and argument. The case will be submitted. You may be excused. Thank you, Your Honor. Thank you, Your Honor.